Martha B. HEATH, as Personal Representative of the Estate of Paul E. Heath, Deceased, Plaintiff,

v.

GENERAL MOTORS CORPORATION, Defendant.

No. IP 89–910–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 8, 1991.

Robert T. Keen, Jr., Miller Carson & Boxberger, Fort Wayne, Ind., for plaintiff.

Richard A. Huser, Locke Reynolds Boyd & Weisell, Indianapolis, Ind., Steven D. McCormick, Kirkland & Ellis, Chicago, Ill., for defendant.

BARKER, District Judge.

This matter comes before the court on the motion of the defendant, General Motors Corporation ("GM"), for partial summary judgment, filed April 16, 1990. The plaintiff, Martha B. Heath, filed her brief in opposition on June 1, 1990, and GM replied on June 22, 1990. For the reasons set forth below, GM's motion for partial summary judgment is GRANTED.

## I. BACKGROUND

The facts pertinent to the court's ruling on the motion for partial summary judgment are not in dispute. On August 18, 1987, plaintiff's decedent, Paul E. Heath, died from head injuries sustained when the 1987 Cadillac Fleetwood Brougham he was driving left State Road 32 in Randolph County, Indiana, and struck a tree. The Cadillac was equipped with manual three-point lap-and-shoulder belts in the front outside seats and a dashboard light and buzzer to encourage their use, but not with airbags or other passive restraint devices. Paul Heath's personal representative brought this wrongful death action against GM, the designer and manufacturer of the Cadillac. She claims that GM is strictly liable in tort for placing the Cadillac into the stream of commerce in a defective condition unreasonably dangerous for the use of the ordinary consumer.

The particular theory of recovery on which GM seeks partial summary judgment is the plaintiff's claim that GM should have equipped the Cadillac with a passive restraint device, such as an air bag, and that such equipment would have prevented Paul Heath's death (the "passive restraint claim"). GM argues that this state-law cause of action is preempted by federal law concerning motor vehicle safety.

## II. DISCUSSION

A motion for summary judgment cannot be granted unless there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202, 211 (1986).

With this principle in mind, the court will consider the legislative and regulatory background of this suit and the arguments of the parties concerning the appropriateness of summary judgment.

### A. *Federal Legislative and Regulatory Framework*

In 1966, in response to the "soaring rate of death and debilitation on our Nation's highways," S.Rep. No. 1301, 89th Cong., 2d Sess. 1, *reprinted in* 1966 U.S.Code Cong. & Admin.News 2709, 2709, Congress enacted the National Traffic and Motor Vehicle Safety Act of 1966, Pub.L. No. 89–563, 80 Stat. 718 (codified as amended at 15 U.S.C. §§ 1381–1431 (1988) [the "Safety Act"]. The purpose of the Safety Act was "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381. To this end, the Safety Act gave the Department of Transportation the authority to promulgate federal motor vehicle safety standards ("FMVSS"). 15 U.S.C. §§ 1391(2), 1392(a).

The FMVSS concerned in this case is FMVSS 208, entitled "Occupant crash protection." When it was first adopted in 1967, FMVSS 208 required the installation of manual safety belts in all cars. *See* 32 Fed.Reg. 2408, 2415 (1967). Since then, FMVSS has had "an intricate and contentious history." *Wood v. General Motors Corp.*, 865 F.2d 395, 398 (1st Cir.1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990); *see id.* at 398–99; *State Farm Mut. Auto. Ins. Co. v. Department of Transp.*, 680 F.2d 206, 209–18 (D.C.Cir.1982) ["*State Farm I*"], *vacated sub nom. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 477–78 (D.C.Cir.1986) ["*State Farm II*"], *cert. denied,* 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). The current version, which is also the version in force when Paul Heath's 1987 Cadillac was manufactured, was adopted in 1984. *See* 49 Fed.Reg. 28,962 (1984) (codified at 49 C.F.R. § 571.208 (1989)). It provides for a gradual phase-in of mandatory passive re-

straints in all cars. Under this version, car manufacturers had to equip 10% of cars built in the 1987 model year, 25% of cars built in the 1988 model year, 40% of cars built in the 1989 model year and all cars built on or after September 1, 1989, (that is, beginning with the 1990 model year) with passive restraint devices, such as air bags, automatic safety belts or any other passive device that meets certain performance criteria. 49 C.F.R. § 571.208, S4.1.3—S4.1.4 (1989). The 1984 version was the first version mandating passive restraints that remained in force into the implementation period.[1] *See State Farm I,* 680 F.2d at 209–18 (providing a thorough history of FMVSS, from its beginning, in 1967, through 1981); *State Farm II,* 802 F.2d at 477–78 (completing the history through the 1984 version of FMVSS, still in force). Previously, car manufacturers always had the option of installing manual safety belts in all of their cars. *See, e.g.,* 49 C.F.R. § 571.208 (1980).

The Safety Act contains two seemingly conflicting provisions. One, the "preemption clause," provides:

> Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.

15 U.S.C. § 1392(d). The other, the "savings clause," provides:

> Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law.

15 U.S.C. § 1397(k).

### B. Preemption

Through the supremacy clause, U.S. Const. art. VI, cl. 2, courts find that federal legislation or regulations preempt state law under three circumstances: first, state law is expressly preempted when the federal law, by its terms, explicitly states an intention to preempt state law; second, the courts will imply preemption when federal law so pervasively regulates a subject as to reveal an intent to "occupy a given field"; and, third, the courts will imply preemption when the state law "actually conflicts" with the federal law, either because no one could comply with both laws, or because the state law "stands as an obstacle to the accomplishment of the full purposes and objectives" of Congress or the federal agency. *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 299–300, 108 S.Ct. 1145, 1150–51, 99 L.Ed.2d 316 (1988).

GM argues that Martha Heath's passive restraint claim is expressly preempted by the Safety Act's preemption clause and also impliedly so because, if allowed, it would stand as an obstacle to the accomplishment of the federal objectives underlying the Safety Act and FMVSS 208.

Martha Heath, on the other hand, argues not only that the preemption clause does not expressly preempt her common law claim, but also that the savings clause evidences explicit congressional intent to *preserve* it. Furthermore, she argues that her claim is not impliedly preempted, because potential liability at common law does not present the same conflict with federal purposes as direct state regulation, and because FMVSS 208 describes merely "minimum" standards. For this last point, the plaintiff relies on 15 U.S.C. § 1391(2), which supplies the following definition: " 'Motor vehicle safety standards' means a minimum standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria."

### 1. Express Preemption

A few courts have found the preemption clause expressly to preempt pas-

---

**1.** The 1972 version would have mandated passive restraints in all cars built after August 15, 1975, but its implementation date was first extended by a year and subsequently, in 1976, this passive restraint requirement was abandoned altogether. *See State Farm I,* 680 F.2d at 210–11.

sive restraint claims. *See, e.g., Wattelet v. Toyota Motor Corp.,* 676 F.Supp. 1039, 1040 (D.Mont.1987); *Cox v. Baltimore County,* 646 F.Supp. 761, 763 (D.Md.1986); *Vanover v. Ford Motor Co.,* 632 F.Supp. 1095, 1096–97 (E.D.Mo.1986); *Wickstrom v. Maplewood Toyota, Inc.,* 416 N.W.2d 838 (Minn.Ct.App.1987), *cert. denied,* 487 U.S. 1236, 108 S.Ct. 2905, 101 L.Ed.2d 937 (1988). Many more courts, however, have found passive restraint claims *not* expressly preempted, because the preemption clause does not explicitly mention common law, and because the savings clause, when considered in combination with the preemption clause, makes ambiguous Congress's intent with respect to preemption of state common law claims. *See, e.g., Pokorny v. Ford Motor Co.,* 902 F.2d 1116 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990); *Taylor v. General Motors Corp.,* 875 F.2d 816 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Kitts v. General Motors Corp.,* 875 F.2d 787 (10th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Kolbeck v. General Motors Corp.,* 702 F.Supp. 532 (E.D.Pa. 1988); *Schick v. Chrysler Corp.,* 675 F.Supp. 1183 (D.S.D.1987); *Baird v. General Motors Corp.,* 654 F.Supp. 28 (N.D. Ohio 1986); *Garrett v. Ford Motor Co.,* 684 F.Supp. 407 (D.Md.1987).

No seventh circuit case addresses the issue of whether passive restraint claims are expressly preempted by the Safety Act. This court is persuaded that the Safety Act, when considered in its entirety, does not express an unambiguous congressional intent to preempt state common law passive restraint claims. By the same token, it does not unambiguously express an intent to preserve such claims. *Cf., e.g., Taylor,* 875 F.2d at 825 n. 18; *Wood,* 865 F.2d at 402; *Schick,* 675 F.Supp. at 1185.[2]

### 2. Implied Preemption

■ Although most courts agree that the Safety Act does not expressly preempt passive restraint claims, most courts have found that the Safety Act and the regulations promulgated under it impliedly preempt these claims, because a common law judgment might force on manufacturers a *de facto* safety standard in conflict with the federal regulations. *See, e.g., Pokorny,* 902 F.2d 1116; *Taylor,* 875 F.2d 816; *Kitts,* 875 F.2d 787; *Wood,* 865 F.2d 395; *Dallas v. General Motors Corp.,* 725 F.Supp. 902 (W.D.Tex.1989); *Staggs v. Chrysler Corp.,* 678 F.Supp. 270 (N.D.Ga. 1988); *Schick,* 675 F.Supp. 1183; *Baird,* 654 F.Supp. 28. The plaintiff's argument that a common law standard cannot create a conflict in the way that state legislation and regulations can, *see* Memorandum in Opposition to Motion for Partial Summary Judgment ["Memorandum in Opposition"] 10–11, is without merit. *See, e.g., Pokorny,* 902 F.2d at 1122; *Taylor,* 875 F.2d at 826.

Obviously, there is no conflict in the sense that compliance with both FMVSS and a common law standard that effectively mandates the inclusion of passive restraints in all cars would be "a physical impossibility." *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). Courts finding implied preemtion of passive restraint claims have concluded instead that such claims conflict with federal law in the sense that they would obstruct the purposes behind the Safety Act and FMVSS 208. GM says these underlying purposes are: uniformity, flexibility, minimization of public opposition to passive restraints and the encouragement of a wide variety of restraint technologies. Brief in Support of Defendant's Motion for Partial Summary Judgment ["Brief in Support"] 8–13. In the absence of guidance from the

---

2. This court's earlier decision in *Reed v. Ford Motor Co.,* 679 F.Supp. 873 (S.D.Ind.1988), does not compel our finding otherwise here. That case held that the savings clause evidences Congress's intent not to occupy the field with respect to automobile recalls; therefore, a common law suit for punitive damages based on the manufacturer's failure to recall was not preempted. *Reed* has nothing to do with the much narrower question, presented here, of whether a passive restraint claim is impliedly preempted because it conflicts with a particular FMVSS.

Seventh Circuit on the implied preemption issue, the court will address each of these purported areas of conflict in turn.

### a. uniformity

The First Circuit, in *Wood*, whose reasoning was adopted by the Tenth Circuit in *Kitts*, has found that common law passive restraint claims would interfere with the congressional interest in uniformity. Although apparently accepting that the primary goal of the Safety Act and of the FMVSS is to increase safety, *Wood* found an air bag suit preempted because, "if successful, [it] would stand as an obstacle to Congress's chosen *method* of increasing automobile safety," that is, uniform national safety standards. *Wood*, 865 F.2d at 412 (citing *International Paper Co. v. Ouellette*, 479 U.S. 481, 494, 107 S.Ct. 805, 813, 93 L.Ed.2d 883 (1987) ("A state law is ... preempted if it interferes with the methods by which the federal statute was designed to reach [its ultimate] goal.")) In support of its argument that uniformity was one of Congress's concerns, *Wood* relies on the preemption clause of the Safety Act, which prohibits states from establishing standards "not identical to" the federal ones, 15 U.S.C. § 1392(d), and a 1966 passage from the legislative history of the Safety Act, in which the Senate committee says, "The centralized, mass production, high volume character of the motor vehicle manufacturing industry in the United States requires that motor vehicle safety standards be not only strong and adequately enforced, but that they be uniform throughout the country." S.Rep. No. 1301, 89th Cong., 2d Sess. 12, *reprinted in* 1966 U.S.Code Cong. & Admin.News 2709, 2720. The *Wood* court explained away the contrary implications of the savings clause, which preserves claims based on a common law standard more stringent than the federal, and of the next paragraph in the legislative history, which states, "Moreover, the Federal minimum safety standards need not be interpreted as restricting State common law standards of care." *Id.* It did so by arguing that in 1966, when the Safety Act was enacted, Congress could not have foreseen the emergence of design defect lawsuits based on a theory of "crashworthiness," which might create standards in conflict with the FMVSS.

This court does not find the *Wood* analysis of the uniformity issue persuasive. More persuasive is that of *Pokorny*. The *Pokorny* court reasoned that uniformity was not a primary congressional goal, given the Safety Act's purpose clause, which mentions only the reduction of death and injury, 15 U.S.C. § 1381, and the savings clause, 15 U.S.C. § 1397(k), which specifically contemplates state common law standards different from federal standards. *Pokorny*, 902 F.2d at 1122. Moreover, *Pokorny* specifically rejected the *Wood* court's determination that Congress did not foresee design defect suits in 1966 and that therefore the savings clause should not be interpreted to preserve them. *Id.* at 1121 n. 6; *see also Wood*, 865 F.2d at 420–23 (Selya, J., dissenting) (concluding from, *inter alia*, the state of tort law in 1966 that the savings clause should be interpreted broadly, to preserve design defect claims).

As to the plaintiff's suggestion that uniformity is not a federal goal because FMVSS 208 establishes merely "minimum" standards, we are in agreement with those courts that have rejected this argument. The *Wood* court, for example, reasoned that FMVSS 208 is only a "minimum" in the sense that manufacturers are free to provide greater protection to consumers than it mandates; not in the sense that *state law* may impose higher standards on manufacturers, given that the preemption clause prohibits any non-"identical" state standard. *Wood*, 865 F.2d at 414.

### b. minimization of public opposition

GM argues that two of the purposes underlying the current version of FMVSS 208 conflict with the allowance of the plaintiff's suit. One, that the gradual phase-in would encourage the development of a variety of restraint technologies, is identical to the purpose of flexibility that GM also finds in the Safety Act itself; these purposes will therefore be considered jointly below.

The other is the minimization of public opposition to mandatory passive restraints. Although the Department of Transportation indeed listed the likely overcoming of public resistance as an advantage of a gradual phase-in of passive restraints, 49 Fed.Reg. 29,000 (1984), this does not seem to have been a primary goal of the regulations, since the regulations themselves contain a purpose clause that mentions only the reduction of death and injury. 49 C.F.R. § 571.208 S2 (1989). Furthermore, minimization of public resistance was apparently also not essential to the *method* by which the government planned to increase safety, since the phase-in percentages were merely *minimums*. 15 U.S.C. § 1391(2) (FMVSS "means a minimum standard."); 49 C.F.R. § 571.208 S4.1.3.1.2 ("not less than ten percent of" model–year–1987 cars to contain passive restraints). Car manufacturers were free in 1987, just as before, to include passive restraints in every one of their new cars, so any reduction of public opposition was probably anticipated merely as a possible side-effect, though a happy one, rather than a necessary feature of the regulatory scheme.

### c. *flexibility and encouragement of alternative technologies*

■ The most compelling argument in the cases holding passive restraint suits impliedly preempted by FMVSS 208 is that Congress and the Department of Transportation specifically intended manufacturers to have a choice among restraint devices, both passive and active. *See, e.g., Pokorny*, 902 F.2d at 1123; *Taylor*, 875 F.2d at 826–27; *Dallas*, 725 F.Supp. at 906; *Kolbeck*, 702 F.Supp. at 541. This argument is particularly persuasive when applied, as all the cases heretofore have done, to pre–1987 cars. Until the 1987 model year, manual seat belts were an option for all cars, *see*

*State Farm I*, 680 F.2d at 209–18; *State Farm II*, 802 F.2d at 477–78, and the regulatory history of each of the pre–1984 versions of FMVSS 208 indicates that flexibility and choice among both passive and manual devices were "an essential element of the regulatory scheme." *Pokorny*, 902 F.2d at 1124 (collecting references in the regulatory history).[3]

The 1984 version of FMVSS 208, however, which is at issue here, is remarkably different. For the first time, the Department of Transportation determined that passive restraints must become mandatory, because the low rate of use of manual seat belts results in their not sufficiently reducing death and injury statistics. 49 Fed. Reg. 28,996–97. The Department decided, in a reversal of previous policy, to *require* passive restraints, by phasing them in gradually between 1987 and 1990. *See* 49 C.F.R. § 571.208 (1989). Indeed, the Department not only decided gradually to eliminate manufacturers' flexibility to choose the manual seat belt option; it further sought to narrow the options by giving an incentive for manufacturers to include passive restraints other than automatic seat belts during the phase-in period. *See* 49 C.F.R. § 571.208 S4.1.3.4(a) (1989) (manufacturers receive extra credit towards passive restraint quota for every car that contains passive restraint other than automatic seat belt); 49 Fed.Reg. 29,000 (19884) (explaining same). This policy change makes the implied preemption analysis, whereby the court asks whether an "actual conflict" with federal goals would arise if this suit proceeded, slightly different and more difficult than in previous cases, all of which involved prior versions of FMVSS 208, and hence different "methods" of achieving statutory and regulatory purposes.

---

**3.** GM also attempts to find support in 15 U.S.C. § 1410b for its argument that Congress intended to endorse flexibility and manual seat belts, rather than a passive restraint requirement. Section 1410b requires the rescission of the unpopular "ignition interlock" rule and imposes procedural requirements on the Secretary of Transportation's ability to mandate passive restraints. For the reasons stated by the government in its *amicus curiae* brief on the petition for *certiorari* in the *Wood* case, this court finds Section 1410b irrelevant to the resolution of the case at hand. *See* Brief for the United States as Amicus Curiae, *Wood v. General Motors Corp.,* —— U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990) (attached as Exhibit A to Martha Heath's Memorandum in Opposition).

This court is persuaded that although the methods by which the regulatory scheme attempts to achieve its underlying safety goal have changed considerably, so that complete flexibility for manufacturers to choose between manual and passive restraints is no longer considered desirable, nonetheless the allowance of this suit would conflict with an important purpose of the phase-in plan. Specifically, the key purpose of the phase-in (during which Paul Heath's Cadillac was manufactured) was to encourage manufacturers to develop a wide array of passive restraint technologies; it was feared that if manufacturers were required to install passive restraints in all cars as of September 1, 1987,[4] they would all have to comply by installing automatic safety belts only, whereas other passive devices might, given a little more time, be developed that would be more effective, cheaper and cause less public resistance. *See* 49 Fed.Reg. 29,000. Thus, even though manual restraints were eventually to be phased out, the Department had reasons relating to its overriding safety concerns for allowing manufacturers to have the option, in 1987, to provide manual restraints in 90% of cars manufactured that year. This aspect of the regulatory scheme of FMVSS 208 poses an "actual conflict" with the allowance of a passive restraint claim, which might have the effect of retroactively requiring passive restraints in 100% of model–year–1987 cars. The plaintiff's passive restraint claim is, therefore, impliedly preempted.

### C. Questions of Fact

The plaintiff suggests that one genuine issue of material fact exists that prevents us from granting partial summary

judgment. The penultimate paragraph of her brief states (*in toto*):

> In addition, plaintiff is asserting a claim that the federally-mandated passive restraints should have been installed in this car rather than others chosen by General Motors. Clearly, a question of fact exists with respect to this issue precluding summary judgment.

Memorandum in Opposition 15. The plaintiff cites no authority, and the court has been unable to find any, for her premise that car manufacturers had anything less than complete discretion to decide which cars to provide with air bags so as to meet the phase-in quotas. Nor does she present any factual evidence to support her claim that GM acted improperly in choosing not to use Paul Heath's Cadillac to satisfy the ten percent quota. The court finds this claim insufficient as a matter of law.[5]

### III. CONCLUSION

Finding there to be no genuine issues of material fact and that defendant is entitled to partial summary judgment as a matter of law, the court GRANTS the defendant's motion for summary judgment on the passive restraint claim, and enters partial judgment accordingly.

It is so ORDERED.

---

4. In 1984, at the time of promulgation of the mandatory requirement, this date was determined to be the earliest on which the Department could have required passive restraints in all new cars. 49 Fed.Reg. 28,999 (1984).

5. The defendant suggests another reason why plaintiff's final argument does not preclude summary judgment:

Plaintiff cannot circumvent preemption in this way. As a matter of law, FMVSS 208 did not require airbags in 100% of 1987 cars, and that is what plaintiff's "question of fact" proposes. For any person injured in a 1987 car not subject to the phase-in could make this argument about their particular car, and thus as a practical matter all cars must have airbags. Allowing this claim would undermine the federal scheme as surely as allowing any of the other variations of airbag claims.

Reply Brief of General Motors Corporation in Support of Motion for Partial Summary Judgment 19 n. 12.